BURNHAM & HAMMOND, INC., Plaintiff-Appellee and Cross-Appellant, *v.* CENTRAL BAPTIST HOME FOR THE AGED, Defendant-Appellant and Cross-Appellee—(Bilal Engineering Company *et al.*, Defendants).

First District (3rd Division)    No. 81—1967

Opinion filed September 28, 1983.

Flynn, Galvin & Ryan, of Chicago (Edward J. Fitzsimons, Richard T. Ryan, and Emmett J. Galvin, of counsel), for appellant.

William D. Serritella, of Chicago (Ross, Hardies, O'Keefe, Babcock & Parsons, of counsel), for appellee.

JUSTICE McGILLICUDDY delivered the opinion of the court:

The plaintiff, Burnham & Hammond, Inc. (Burnham & Hammond), an architectural and engineering firm, brought this action in chancery to foreclose a mechanic's lien against the defendant, Central Baptist Home for the Aged (Central Baptist). Central Baptist filed an answer alleging breach of contract and a counterclaim alleging breach of duty. The trial court granted the plaintiff's motion for summary judgment, entered a decree of foreclosure and sale, and stayed enforcement of the decree pending resolution of defendant's counterclaim. The trial court further decreed, as follows: "This is a final order from which an appeal may be taken immediately." The trial court also transferred the counterclaim to the law division of the circuit court of Cook County for trial on its merits. The counterclaim is still pending. Central Baptist appeals from the order granting summary judgment to the plaintiff, and Burnham & Hammond cross-appeals from the order staying enforcement of the summary judgment. The issues raised by the parties are whether genuine issues of material

fact existed as to cost limitation or performance in accordance with professional standards, and whether the trial court erred in staying enforcement of the decree of foreclosure and sale.

Burnham & Hammond produced a feasibility study for Central Baptist containing recommendations and a $1,535,000 construction estimate for the development of a skilled care addition. Based on the study, Burnham & Hammond contracted to render architectural and engineering services for the project. The standard form agreement, which was signed on February 19, 1973, contained the following relevant provision:

"CONSTRUCTION COST *** 3.4 Statements of Probable Construction Cost and Detailed Cost Estimates prepared by the Architect represent his best judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has any control over the cost of labor, materials or equipment, over the contractors' methods of determining bid prices, or over competitive bidding or market conditions. Accordingly, the Architect cannot and does not guarantee that bids will not vary from any Statement of Probable Construction Cost or other cost estimate prepared by him."

In May 1973, Burnham & Hammond submitted its initial design and a revised construction cost estimate of $2,203,780, increasing the cost of the new construction of a skilled care facility from $1,152,000 to $1,785,780. Central Baptist's Board of Directors (the Board) approved the design and revision. On July 12, 1973, Central Baptist remitted $14,343.75 to Burnham & Hammond. Further modifications of the program, including a cost estimate of $2,370,000 for the skilled care addition, were approved by a letter dated October 2, 1973, from the Board. The letter authorized Burnham & Hammond to proceed, stating: "Preliminary drawings, for State review and construction estimates, are to be prepared as soon as possible." On November 19, 1973, Burnham & Hammond produced the preliminary drawings and a revised total project budget of $2,789,975 for the skilled care addition. This amount included a construction estimate of $2,370,000 plus fees and furnishings of $419,975. Both were accepted and approved by Central Baptist.

On January 10, 1974, Burnham & Hammond sent Central Baptist an invoice for $57,570.15, based upon the $2,370,000 estimate for the skilled care addition and $673,975 for an apartment building or a total construction cost of $3,043,975. Central Baptist paid the invoice in full on January 28, 1974. A letter from Central Baptist dated April

22, 1974, authorized Burnham & Hammond to prepare construction documents for bidding on the skilled care addition and to prepare specifications for bidding on the apartment building, and stated that the Board understood there would be an adjustment in fee.

By letter dated August 27, 1974, Central Baptist directed Burnham & Hammond to "hold in abeyance work on the plans of the Skilled Care Addition until we have resolved the problem of State Comprehensive Plan Agency Authorization." Accordingly, on October 21, 1974, Burnham & Hammond submitted to Central Baptist a final invoice in the amount of $20,472, based upon the $3,043,975 total construction cost estimate. Central Baptist paid the invoice in full on December 17, 1974.

On January 3, 1975, Central Baptist advised Burnham & Hammond as follows:

> "The Board of Directors of the Central Baptist Home for the Aged has voted to proceed with the building of the Skilled Care Addition. The motion reads, 'to inform Burnham and Hammond, Inc. of our letter to Mr. William K. Ewing of the Illinois Health Facilities Planning Board requesting a review of the plans for our Skilled Care Addition'. The intent of this motion is to continue (or reactivate, if necessary) the contract with your firm for the Architectual [sic] and Engineering services of the Nursing Building project."

In March 1975, the Health Facilities Planning Board in Springfield informed Central Baptist that health facilities whose construction contracts were signed before the Certificate of Need Law became effective would be permitted to build. Central Baptist called a "very urgent" meeting of its executive and building committees for April 7, 1975, stating that "we must investigate all possibilities to avoid further delays in the Home Developement [sic] program." Central Baptist believed that if it failed to enter into a contract with a builder before July 1975, it would be necessary to request permission to build under the certificate-of-need law, and it was possible that such request would be denied.

On June 9, 1975, Central Baptist advised the Illinois Department of Public Health, Division of Geriatric & Long Term Care Programs, of its contract with Burnham & Hammond. On the same day, the Board authorized Central Baptist to enter into a contract with S.N. Nielsen (Nielsen) for the construction of the skilled care addition "at a guaranteed maximum cost *** not to exceed four million dollars." On June 23, 1975, Burnham & Hammond submitted to Central Baptist an interim report covering a summary of contract negotiations with Niel-

sen indicating the current guaranteed maximum cost proposal of $3,964,771. The report indicated that this represented the maximum contract amount, and that competitive bidding was expected to result in a lower total construction cost. It also included a list of features which could be eliminated in order to reduce expenses. On June 25, 1975, Central Baptist entered into a contract with Nielsen for the construction of the skilled care facility at the maximum cost of $3,964,771.

By October 3, 1975, the project had reached the bidding or negotiation phase. Pursuant to the contract, the amount of the architect's fee which would be due at this point would be calculated at 80% of 6.75% of the construction cost of $3,964,771, per the contract with Nielsen. Accordingly, Burnham & Hammond sent an invoice to Central Baptist stating the amount due as follows:

| | |
|---|---:|
| Construction cost | $3,964,771.00 |
| Architect's fee at 6.75% | $ 267,622.04 |
| Fee now due 80% | $ 214,097.63 |
| Previous payments | 55,991.25 |
| Amount due | $ 158,106.38 |
| Add - Printing and reproduction | 2,852.64 |
| Travel | 364.46 |
| Amount due | $ 161,323.48 |

On October 12, 1975, Central Baptist authorized Nielsen to begin construction immediately. On November 13, 1975, Central Baptist directed Burnham & Hammond to proceed with certain changes in the storm water retention system. In a letter dated December 30, 1975, Central Baptist remitted $30,000 to Burnham & Hammond and stated:

"Enclosed please find check #159 in the amount of $30,000.00 as part payment of amount due for the services rendered by your firm. We regret the problems we are encountering in the securing of long-term financing, so we can only ask for your patience in the matter of payment."

Myron Dudek, the administrator of Central Baptist, sent a financial summary dated January 13, 1976, to the executive committee, building committee and pastors of Central Baptist which acknowledged the outstanding balance of $131,323.48 due to Burnham & Hammond. On January 20, 1976, Central Baptist was informed by the Continental Bank that its request for interim construction financing had been denied because "the substance of [Central Baptist's] financial statements do [sic] not warrant a $4,000,000 project." In a letter

dated March 8, 1976, Central Baptist directed Burnham & Hammond to proceed with certain changes, and stated that it understood that there would be an extra cost for this additional work. On March 24, 1976, Dudek again calculated the amount owed to the architect for services rendered to that date as $131,323.48.

On April 9, 1976, Central Baptist advised Burnham & Hammond that construction would be halted on or about April 26, 1976, due to its inability to obtain financing. On June 21, 1976, the Board decided to terminate its contract with Burnham & Hammond and negotiate a settlement for the balance owed. By letter dated July 20, 1976, Central Baptist terminated the services of Burnham & Hammond.

On August 9, 1976, Burnham & Hammond filed a claim for a lien, in the amount of $141,375.93 for architectural and engineering services rendered on Central Baptist's property, with the recorder of deeds of Cook County, Illinois.

On April 11, 1977, Burnham & Hammond filed a complaint in the circuit court of Cook County against Central Baptist to foreclose the mechanic's lien. The complaint alleged that the value of the work performed was $255,881.09 plus extras of $7,040.31, and that after credit for partial payments there was a balance due Burnham & Hammond of $140,535.60, plus interest at 6% per annum from July 20, 1976.

On October 6, 1977, Central Baptist filed an answer which alleged that the architectural fee was to be calculated at 6.75% of a construction cost of $2,125,000. Additionally, Central Baptist filed a counterclaim which alleged that Burnham & Hammond had not acted in accordance with the prevailing skills and abilities of architects in the community. The counterclaim is not at issue in this appeal.

On August 12, 1980, Burnham & Hammond filed a motion for summary judgment on its complaint. The motion was supported by 29 exhibits including the pretrial discovery deposition of Myron Dudek, the administrator of Central Baptist. In its response, Central Baptist argued that genuine issues of material fact existed as to whether Burnham & Hammond had breached the contract by not performing in accordance with professional standards, and whether Burnham & Hammond had breached the contract by not adhering to the cost limitation included in the contract. The response was supported by affidavits of Dudek and David Perez, the architect subsequently employed by Central Baptist to develop its present skilled care addition.

On January 28, 1981, the trial court granted Burnham & Hammond's motion for summary judgment and entered a decree of foreclosure and sale, and stayed enforcement of the decree pending resolution of the counterclaim. The trial court found an amount of

$139,062.10 to be due and owing to Burnham & Hammond from Central Baptist, computed as follows:

Architect's fee:

| | |
|---|---:|
| 80% of 6.75% of the $3,964,771 cost of construction | $214,097.63 |
| Supervisory work through foundation | 5,388.81 |
| Additional work relative to plan revisions made at the request and instance of defendant | $ 2,349.81 |
| Printing costs | 2,852.64 |
| Travel expense | 364.46 |
| | $225,053.35 |
| Less - payments | 85,991.25 |
| Net amount due | $139,062.10 |

The trial court further found that statutory interest on the above amount at the rate of 5% per annum was due and owing for the period July 20, 1976, to January 28, 1981. The trial court also stated: "This is a final order from which an appeal may be taken immediately."

On July 10, 1981, when the trial court denied Central Baptist's motion to vacate the decree of foreclosure and sale, it transferred the cause to the law division of the court for trial on the merits of the counterclaim.

Central Baptist appeals the granting of the motion for summary judgment. It contends that summary judgment was erroneously entered because there are genuine issues as to material fact. On cross-appeal, Burnham & Hammond contends that the trial court erroneously stayed enforcement of the decree of foreclosure and sale.

Before we discuss the issues presented by the parties, it is our duty to determine whether we have jurisdiction in the subject matter of this appeal, even though the question has not been raised by either party. The threshold question is whether the trial court's order is final and appealable. *Trizzino v. Kline Brothers Co.* (1982), 106 Ill. App. 3d 230, 435 N.E.2d 958.

Supreme Court Rule 301 provides in pertinent part as follows:

"Every final judgment of a circuit court in a civil case is appealable as of right." (87 Ill. 2d R. 301.)

Rule 301 as to the appealability of final orders is qualified by Rule 304(a), which provides as follows:

"(a) *Judgments As To Fewer Than All Parties or Claims - Ne-*

*cessity for Special Finding.* If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims *only if the trial court has made an express written finding that there is no just reason for delaying enforcement or appeal.* \*\*\* In the absence of such a finding, any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties." (Emphasis added.) 87 Ill. 2d R. 304(a).

The order which is the subject matter of this appeal provides that its enforcement is stayed pending resolution of defendant's counterclaim. Therefore, even if we were to affirm the order, the plaintiff would not be able to thereby enforce or obtain an execution of the order. As a result, the order does not terminate the litigation between the parties in the initial action so that it is a final order from which an appeal can be taken. (See *Havlen v. Waggoner* (1981), 92 Ill. App. 3d 916, 918, 416 N.E.2d 684.) Of course, the inclusion of the special finding in the trial court's order cannot confer appellate jurisdiction if the order is not in fact final. *Crane Paper Stock Co. v. Chicago & Northwestern Ry. Co.* (1976), 63 Ill. 2d 61, 66, 344 N.E.2d 461.

Accordingly, we are without jurisdiction to dispose of the matter on its merits and the appeal is dismissed.

Appeal dismissed.

RIZZI and WHITE, JJ., concur.